UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-1725(DSD/JMM)

Tamrat Tademe,

Plaintiff,

v.

**ORDER**

St. Cloud State University, a Minnesota State University,

Defendant.

Leslie L. Lienemann, Esq. and Lienemann Law Office, 210 River Ridge Circle, Burnsville, MN 55337, counsel for plaintiff.

Gary R. Cunningham, Assistant Minnesota Attorney General, 445 Minnesota Street, St. Paul, MN 55101, counsel for defendant.

This matter is before the court on defendant's motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.

## BACKGROUND

In 1991, defendant St. Cloud State University ("SCSU") hired plaintiff Tamrat Tademe, a black Ethiopian, for a probationary (tenure track) position in the Department of Human Relations and Multicultural Education, College of Education. Plaintiff had worked as a fixed term assistant professor at SCSU for two years.

FILED 12-10-01
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 12-10-01
Deputy Clerk's Initials

The published educational requirements for plaintiff's new position included a master's degree, but not a doctoral degree. When he was hired, plaintiff had a Bachelor of Arts, Political Science (1979) and Master of Arts, Public Affairs (1986).

Plaintiff's contract with defendant stipulated that academic tenure would be conditioned upon completion of his Ph.D. Plaintiff was a Ph.D. candidate at the University of Minnesota and his application showed that he intended to complete his Ph.D. in 1991. At SCSU, tenure-track faculty typically come up for tenure in their fifth year. Consequently, from a 1991 perspective, plaintiff's "tenure year" was 1996.

In 1993, plaintiff had not yet completed his Ph.D. Plaintiff requested and received a year paid leave to work on his doctorate.

In 1996, plaintiff requested and was denied tenure. As a result, plaintiff was given a notice of non-renewal effective May 24, 1997. In February 1997, plaintiff, his union and SCSU entered into a grievance settlement with respect to tenure. The settlement provided that plaintiff would be awarded tenure automatically if he completed his Ph.D. on or before September 1, 1997. Plaintiff was granted an additional paid leave for the spring quarter of 1997 and unpaid leave in 1997-1998 to work on his Ph.D. Plaintiff completed his doctorate in 1997 and defendant granted him tenure that same year.

In 1998, plaintiff received the associate professor rank, seven years after defendant hired him for the tenure-track position. Defendant initially hired plaintiff as a probationary faculty member at the rank of assistant professor, while defendant hired Suellyn Hofmann, a white woman, at the higher rank of associate professor that same year.

Although defendant hired plaintiff and Hofmann in the same year, defendant paid Hofmann more than plaintiff. In 1998 and 1999, plaintiff complained about his salary to Dean Joane McKay and to President Bruce Grube. According to plaintiff, Grube promised that he would adjust plaintiff's salary. McKay did evaluate whether plaintiff's salary had advanced according to the salary grid. Grube, however, did not raise plaintiff's salary.

Throughout plaintiff's employment with SCSU, plaintiff has opposed racism and discrimination within SCSU and the community. Plaintiff was frequently quoted or referred to in campus and local newspapers as a result of this activism. He also formed a student group and was a member of a faculty group that opposed racism on campus. Plaintiff contends that defendant retaliated against him after he became know for this activism in the following ways:

1. evaluating plaintiff's performance negatively without cause;

2. falsely accusing plaintiff of harassing or intimidating faculty members and students;

3. threatening violence against plaintiff;

4. telling plaintiff to go on Prozac;

5. ridiculing plaintiff at faculty meetings;

6. telling students to distance themselves from plaintiff because he was a perceived troublemaker;

7. calling plaintiff "irrational;"

8. entering plaintiff's office without permission;

9. monitoring plaintiff's use of computer equipment and emails;

10. interfering with plaintiff's participation in national conferences;

11. threatening plaintiff with disciplinary action for opposing racism on campus;

12. having plaintiff arrested for participating in a public protest;

13. providing false information to the police and paying for the police to arrest plaintiff and others who gathered to protest racism at SCSU. (Pl.'s Compl. at 4-5.)

In 1999, plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge against SCSU. In 2000, plaintiff filed a complaint against defendant for discrimination on the basis for race and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e. In particular, plaintiff asserts that defendant discriminated on the basis of race

in tenure, promotion, salary and hostile work environment. Defendant now moves for summary judgment and the court grants defendant's motion.

## DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon

mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**B. The Statute of Limitations**

Under Title VII, aggrieved persons must file a complaint with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e). In certain circumstances, the filing period is extended to 300 days. 42 U.S.C. § 2000e-5(e). The purpose of the limitation period is to guarantee "the protection of civil rights laws to those who promptly assert their rights" and to "protect employers from the burden of defending claims arising from employment decisions that are long past." Delaware State College v. Ricks, 449 US 250, 256 (1980). Here, defendant contends that the statute of limitations bars plaintiff's claims of racial discrimination in tenure, salary, promotion and hostile work environment. The court addresses each claim in turn and finds that the statute of

limitation bars plaintiff's claim of discrimination in tenure, promotion and salary.[1]

**1. Tenure**

Plaintiff's claim that defendant discriminated against him by denying him tenure is time-barred. The Supreme Court in Delaware State College v. Ricks stated that, in the Title VII context, the statute of limitations begins to run at the time of the discriminatory conduct, not when the effects of the conduct are felt. Id. at 258. In Ricks, a college faculty claimed that the college discriminated against him on the basis of national origin when it denied him tenure and terminated him. Id. at 252-54. The Supreme Court held that the statute of limitations on plaintiff's claim began to run when the plaintiff was notified that he was denied tenure and would be offered a one-year terminal contract, rather than when the terminal contract expired. Id. at 259. The Supreme Court reasoned that

> the only alleged discrimination occurred-and the filing limitations period therefore commenced-at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure-the eventual loss of a teaching position-did not occur until later. Id. at 258.

[1] Since plaintiff filed his EEOC charge on June 3, 1999, the applicable limitations period runs to August 9, 1998, which is 300 days prior to the filing of the charge. See 42 U.S.C. § 2000e-5(e)(1).

The Court thus concluded that plaintiff's claim was time-barred. Id. at 259.

Similarly, in Cooper v. St. Cloud State University, a professor who was denied tenure brought an action against SCSU under Title VII and the Minnesota Human Rights Act. 226 F.3d 964 (8th Cir. 2000). The Eighth Circuit found that the Title VII limitations period began to run when the professor learned of SCSU's decision to deny him tenure and to terminate his employment if he did not obtain a Ph.D. within a certain time period, rather than when SCSU actually denied him tenure and terminated his employment. Id. at 968. The court therefore affirmed the district court's decision to dismiss plaintiff's Title VII claim as time-barred. Id.

As in Ricks and Cooper, the limitations period on plaintiff's claim of race discrimination in tenure began to run in 1991, when defendant first notified plaintiff that he would receive tenure only if he completed his Ph.D. Because the statute of limitations began to run when plaintiff received this notice, rather than when plaintiff felt the effects of this decision, plaintiff's claim of discrimination in tenure is time-barred.

Defendant argues in the alternative that the statute of limitations on this claim began to run in February 24, 1997, when the parties entered into a settlement agreement requiring plaintiff to receive a Ph.D. as a prerequisite for tenure. At this time,

defendant again notified plaintiff of the tenure requirement. Even if this date started the limitations period by creating a new cause of action for discrimination in tenure, this claim is nevertheless time-barred.

**2. Promotion**

Plaintiff's claim of discrimination in promotion is also time-barred. In Gipson v. KAS Snacktime Co., the Eighth Circuit found that "discrete, adverse employment actions, such as a discharge, layoff, or failure to promote 'constitutes a complete act at the time it occurred." 83 F.3d 225, 228 (8th Cir. 1996). The court determined that "[t]he time for filing an administrative charge or commencing a lawsuit runs from the date of such a discriminatory act, even if its effects on the injured employee are long-lasting." Id. The court therefore concluded that if such an act is not timely challenged, "the right to relief expires...." Id.

In Gipson, plaintiff brought a race discrimination action against defendant, his former employer, alleging violations of the Missouri Human Rights Act and Title VII of the Civil Rights Act of 1964. 83 F.3d at 227. The court found that plaintiff's claim that defendant demoted him based on his race was barred because the actions occurred more than two years before he filed the lawsuit. Id. at 229. The court further found that plaintiff's claim that defendant denied him raises was barred because the denials occurred more than 180 days before he filed his charge. Id. at 227. The

court therefore concluded that plaintiff's challenges to these discrete, adverse employment actions were time-barred. Id.

Here, similar to Gipson, plaintiff claims that defendant discriminated against him by denying him a promotion. Plaintiff specifically alleges that defendant promoted Suellyn Hofmann, a white women, to the position of associate professor when she was hired into a tenure-track position, but did not give plaintiff that same promotion until 1998 because of his race. (Tademe Aff., Ex. 2, 3, 8; Leinemann Aff., Ex. 14.) Similar to Gipson, plaintiff's claim that he was denied a promotion to associate professor until 1998 is stale because the discrimination did not occur within three hundred days of the discriminatory conduct, or August 9, 1998. Instead, this allegedly discriminatory action was complete at latest when plaintiff received notice of his promotion, which occurred prior to August 9, 1998.[2]

---

[2] Plaintiff's complaint and motion opposing defendant's motion for summary judgment does not allege other specific acts of discrimination in promotion. Plaintiff's motion states: "Defendant offers no explanation for the fact that it promoted Hofmann to the rank of Associate Professor when it hired her into the probationary position. Aff. Exh. 14. Tademe was left at the lower rank of Assistant professor until after he was granted tenure." (Pl.'s Memo. Opp'n Def.'s Mot. Summ. J. at 15.) Because plaintiff omits any references to other discriminatory promotion decisions, the court presumes that plaintiff only claims that defendant discriminated against plaintiff by failing to promote plaintiff to the position of Associate Professor until 1998.

**3. Salary**

Plaintiff's claim of discrimination in salary is likewise time-barred. In Dasgupta v. University of Wisconsin Bd. of Regents, 121 F.3d 1138 (7th Cir. 1997), plaintiff claimed that his salary during the limitations period was much lower than that of his peers as a result of earlier discrimination. Id. at 1140. Although he received raises similar to those that his peers received, plaintiff claimed that he had started from a lower base and thus ended up with a lower salary. Id. The court concluded that plaintiff's claim was time-barred, explaining that "[t]here were no new violations during the limitations period, but merely a refusal to rectify the consequences of time-barred violations."

Here, as in Dasgupta, plaintiff alleges discrimination in pay that is a result of an allegedly discriminatory decision made in 1991. In particular, plaintiff claims that defendant placed Hofmann at a higher step in the salary grid than plaintiff when they were both hired in 1991 because of plaintiff's race. As a result, plaintiff contends that Hoffman has always received a higher salary than plaintiff.[3] Even if defendant discriminated

[3] Because plaintiff has alleged no other evidence of discrimination in pay, the court presumes that this disparity in pay between plaintiff and Hofmann is the only act which plaintiff claims constitutes discrimination in pay.

against plaintiff in placing him at lower step when he was initially hired in 1991, this violation did not occur within the limitations period.

As in Dasgupta, defendant's failure to rectify this past decision does not constitute a continuing violation. Although plaintiff argues that each paycheck is a new discriminatory act for statute of limitations purposes, citing Corbin v. Pan American World Airways, Inc., 432 F. Supp. 939 (N.D. Cal. 1977), plaintiff's argument fails because Corbin addresses a case with evidence of *repeated* and *on-going* failure to promote and denial of equal pay. Unlike Corbin, plaintiff appears to contest only the defendant's initial decision to place Hofmann in a higher salary grid than plaintiff, which was not a repeated and on-going decision made by defendant. While plaintiff may still feel the effects of this decision, these effects do not constitute a continuing violation. See United States Airlines v. Evans, 431 U.S. 553, 558 (1977)(stating that continuing impact of a neutral system cannot form the basis of a continuing violation of Title VII.).

Moreover, even though plaintiff complained about his salary to Dean McKay and President Grube, their failure to raise his salary did not constitute a new Title VII violation. As the Seventh Circuit stated in Dasgupta, "[i]t is not a violation of Title VII to tell an employee he won't get a raise to bring him up to the salary level that he would have attained had he not been

discriminated against at a time so far in the past as to be outside the period during which he could bring a suit seeking relief against discrimination." Dasgupta v. University of Wisconsin bd. of Regents, 121 F.3d at 1140.

#### 4. Hostile Work Environment

Finally, plaintiff's claim of a hostile work environment is not time-barred because it is a continuing violation. Under the "continuing violation" exception to the statute of limitations, a plaintiff may challenge incidents which occurred outside of the statute of limitations period if the various acts of discrimination constitute a continuing pattern of discrimination. Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable, 3 F.3d 281, 285 (8th Cir. 1993)(finding that when Title VII violations are continuing, the limitations period does not begin to run until the last occurrence of discrimination.). "To avail himself of this exception, a plaintiff must demonstrate that some incident of harassment occurred within the 300 day limitations period ... and that there is a sufficient nexus between that incident and the other instances of harassment." Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999); see Kalia v. St. Cloud State University, 539 N.W.2d 828, 835 (Minn. Ct. App. 1995)(finding that there may be redress for unlawful discriminatory acts which occur prior to the statute of limitations if they are related to discriminatory acts that occur within the statutory period.)

In Gipson, the Eighth Circuit held that a hostile work environment is a continuing violation. Gipson v. KAS Snacktime Co., 83 F.3d at 229. The court explained that "[f]or this type of violation, the statute of limitation runs from 'the last occurrence of discrimination.'" Id. (quoting Hukkanen v. Int'l Union of Operating Eng'rs Local 101, 3 F.3d 281, 285 (8th Cir. 1993). According to the court, the key question is whether any present violation exists. Id.

The plaintiff in Gipson alleged that his supervisor continually harassed him because of his race and that defendant's racial harassment continued until plaintiff left the company, after plaintiff filed his EEOC charge. Id. The court found that this allegation was sufficient to plead a hostile work environment on the date of his EEOC Charge and therefore that his claim was not time-barred. Id. Here, as in Gipson, plaintiff also claims that defendant harassed him on account of his race and alleges specific acts of harassment within the statute of limitations that provide support for his continuing violation claim.[4] Thus, plaintiff's claim of discrimination in hostile work environment is not time-barred because an alleged violation occurred within the statute of limitations.

---

[4] For instance, as evidence of the hostile work environment, plaintiff claims that defendant had plaintiff arrested for participating in a protest in the Spring of 2000.

### C. Plaintiff failed to Present a Prima Facie Case of Hostile Work Environment

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Harassment of an employee based on a prohibited factor, including race, is therefore prohibited conduct under Title VII. Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000).

Hostile work environment harassment occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc. 510 U.S. 17, 21 (1993)(citations omitted). To sustain a claim against an employer for a racially hostile work environment, an employee must show that: (1) he or she is a member of a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based upon race, (4) the harassment affected a term, condition, or privilege of employment and (5) the employer knew or should have known of the racially discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment. Willis v. Henderson, 262 F.3d 801, 808 (8th Cir); Robinson v.

Valmont Inds., 238 F.3d 1045, 1047 (8th Cir). The complained of conduct must have been severe or pervasive enough to create an objectively hostile work environment. Harris v. Forklift Sys., Inc. 510 U.S. at 17.

In this case, plaintiff claims that defendant created a hostile work environment in violation of Title VII. He specifically alleges that his colleagues "opposed his hire, opposed his starting salary and had it lowered, made false accusations against him, accused him of engaging in sexual relations with students, impugned his teaching ability in flagrant disregard for his student evaluations, and more." (Pl's Brief at 17.) He further claims that defendant threatened him and had him arrested. Id. While the court finds that plaintiff is a member of a protected class based on his race and was subject to unwelcome harassment, the court concludes that plaintiff fails to establish that he was harassed because of his race or that the harassment he encountered was so severe and pervasive as to violate Title VII. The court therefore grants defendants motion for summary judgment on plaintiff's hostile work environment claim.

**1. Race-Based Animus**

Plaintiff does not present evidence to create a genuine dispute as to whether he was harassed because of his race. In Bradley v. Widnall, 232 F.3d 626 (8th Cir. 2000), the plaintiff, a black civilian employee of the United States Air Force, sued the

Secretary of the Air Force, alleging hostile work environment under Title VII. Plaintiff claimed that her supervisory duties were curtailed and that she was left out of the decision-making process, treated with disrespect and subjected to false complaints. Id. at 631. The court concluded that plaintiff was unable to provide any evidence that the alleged mistreatment was due to her protected status. Id. After reviewing the record, the court instead found that the majority of the problems that plaintiff encountered stemmed from inter-office politics and personality conflicts rather than race-based animus. Id. The Eighth Circuit therefore held that the district court correctly granted summary judgment on plaintiff's hostile work environment claim. Id.

Similarly, in Palesch v. Missouri Commission on Human Rights, 233 F.3d at 566-67, plaintiff alleged that her supervisors harassed her because of her race and gender. In particular, she complained that her co-workers and supervisors frequently ignored her, that she was isolated from office social activities and that a co-worker damaged her car, shoved her against a wall and threatened her with bodily harm. Id. The court determined that plaintiff failed to provide anything more than "bare allegations" that her co-workers harassed her because of her race or her gender. Id. Because the court found no nexus between the alleged harassment and plaintiff's gender or race, the court concluded that plaintiff's hostile work environment claim failed.

As in Bradley and Palesch, plaintiff in this case alleges that defendant created a hostile and abusive work environment and sets out numerous examples of hostilities between plaintiff and defendant. Similar to the plaintiff in Bradley and Palesch, however, plaintiff failed to establish a nexus between this harassment and his race. Because plaintiff fails to establish this element of the hostile work environment test, plaintiff's claim fails.

**2. Hostile or Abusive Work Environment**

Even if plaintiff had established a causal connection between his race and the harassment he encountered, plaintiff does not present evidence to create a genuine dispute as to whether the environment he faced was hostile or abusive. Whether an environment is hostile or abusive "can be determined by looking at all the circumstances." Harris v. Forklift Sys., Inc., 510 U.S. at 23. These circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. Not all unpleasant conditions in the workplace create a hostile work environment. Willis v. Henderson, 262 F.3d at 809-10; Palesch v. Missouri Comm'n on Human Rights, 233 F.3d at 566, Willams v. City of Kansas City, Missouri, 223 F.3d 749, 753 (8th Cir. 2000). More than a few isolated incidents of harassment

must have occurred to establish Title VII violation. See Gilbert v. City of Little Rock, Arkansas, 722 F.2d 1390, 1393 (8th Cir. 1983).

In Bradley, the Eighth Circuit briefly considered the factors that the Supreme Court set out in Harris and concluded that plaintiff's situation was not "so severe or pervasive as to affected a term, condition or privilege of her employment." Id.; see also Scuba v. Nestle U.S.A. Co., 181 F.3d 958, 965-67 (8th Cir. 1999)(observing that unpleasant conduct and rude comments were not so severe or pervasive as to have altered conditions of plaintiff's employment).[5] As in Bradley, plaintiff in this case claims that his white colleagues made false accusations about him, accusing him of engaging in sexual relations with his student and impugning his teaching ability. Like the plaintiff in Bradley who felt excluded from the defendant's decision-making process, plaintiff also alleges that he felt isolated from his colleagues because Hofmann would not attend meetings if he was there. Moreover, while plaintiff claims that defendant opposed plaintiff's hire, objected to his salary, had plaintiff's salary lowered, threatened plaintiff and had plaintiff arrested, the record presents no persuasive

[5] While plaintiff does not identify any evidence of racial harassment in his complaint, plaintiff briefly discusses incidents of racial harassment that he encountered in plaintiff's memorandum opposing defendant's motion for summary judgment at 17. The court bases its analysis on plaintiff's discussion of these incidents.

evidence that defendant took these actions for discriminatory reasons.[6] Based on the totality of circumstance, the court follows the Eighth Circuit's decision in Bradley and concludes that this harassment does not constitute a Title VII violation.

**D. Retaliation**

Plaintiff claims that defendant retaliated against him for opposing racism in violation of 42 U.S.C. § 2000e-3(a), while defendant seeks summary judgment, arguing that plaintiff did not engage in protected conduct and did not suffer adverse employment actions. Plaintiff's retaliation claim fails because plaintiff identifies no adverse employment action that defendant took against plaintiff as a result of plaintiff's participation in protected activity.

---

[6] In fact, the evidence suggests that plaintiff's salary was not less than similarly-situated non-protected class faculty members in his department in most circumstances. In the academic year 2000-2001, only three of eight other faculty members in plaintiff's department earned more than he earned and one of those persons was an African American man. (Grachek Aff. at ¶13.) Another of those professors earned more money because of his seniority and the third professor earned more because she had a Ph.D. when she was hired and thus initially was placed at a higher grade in the salary grid. (Id. at ¶ 14-16.)

Likewise, there is little evidence that defendant threatened plaintiff. In a meeting of plaintiff's college, plaintiff made an comment about the President wearing a coat and tie. (Williams Dep. at 38-39.) President removed his coat in response. (Id.) While plaintiff interpreted this response as a threat, plaintiff offers no persuasive evidence of such a threat.

Moreover, as will be discussed, defendant had legitimate non-discriminatory reasons for having plaintiff arrested since plaintiff and others were trespassing on University property and refused to leave. (Tademe Dep. at 84-85.)

42 U.S.C. § 2000e-3(a) provides in part: "It shall be an unlawful employment practice for an employee to discriminate against any of his employees ... because he has opposed any practice by this subchapter ..." 42 U.S.C. § 2000e-3(a). To succeed on a reprisal claim, plaintiff has the initial burden of proving (1) participation in a protected activity, (2) an adverse employment action and (3) a casual connection between the two occurrences. Stevens v. St. Louis University Medical Center, 97 F.3d 268, 270 (8th Cir. 1996). The defendant may then rebut the plaintiff's case by advancing a legitimate, nonretaliatory reason for the adverse employment action. Id. at 271. If the defendant makes this showing, the plaintiff must show that the proffered reason was a pretext for illegal retaliation. Id.

**1. Protected Conduct**

Plaintiff engaged in protected conduct. Under 42 U.S.C. 2000e-3a, protected conduct includes (1) opposition to employment practices prohibited under Title VII and (2) filing a charge, testifying, assisting or participating "in any manner in an investigation, proceeding or hearing" convened according to Title VII. 42 U.S.C. § 2000e-3a; see also, Stuart v. General Motors Corp., 217 F.3d 621 (8th Cir. 2000)(stating that an employee need not establish the conduct he opposed was in fact discriminatory in order to establish that he engaged in a protected activity; rather, he must demonstrate a good faith, reasonable belief that the

underlying conduct violated the law.). Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)("contesting an unlawful employment practice is protected conduct").

Here, plaintiff visibly and vocally has opposed discrimination at SCSU. Plaintiff was a founding member of the Faculty and Staff of Color Caucus, which was formed to provide support for faculty and administrators of color who were experiencing race discrimination on campus. Plaintiff has been a well-known and frequent speaker at campus speak-outs. (McKay Depo. 44-47; Hofmann Depo. 87-89; Hagen Depo. 34-41; Williams Depo. 76-87.) In May 2000, plaintiff participated in a protest against the allegedly wrongful termination of Native American Nancy Harles.[7] Moreover, plaintiff filed an EEOC charge in June 1999. All of these actions are protected under Title VII.

**2. Adverse Employment Action**

Because plaintiff satisfies the first element of a retaliation claim, plaintiff must then show an adverse employment action. The Eighth Circuit has stated that not everything that makes an employee unhappy is an actionable adverse employment action. LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 691 (8th Cir. 2001); Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1245 (8th Cir. 1998). Rather, according to the Eighth Circuit, an adverse

[7] Defendant acknowledges that this protest constitutes protected conduct.

employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits or responsibilities. LaCroix v. Sears, Roebuck and Co., 240 F.3d at 691; Williams v. City of Kansas City, MO., 223 F.3d at 753 (citing Scuba v. Nestle U.S.A. Co., 181 F.3d at 969; Phillips v. Collings, 256 F.3d 843, 848 (8th Cir. 2001)("Proof of an adverse employment action requires a 'tangible change in duties or working conditions that constitute a material disadvantage.'"). The employment action must "rise to the level of an ultimate employment decision intended to be actionable under Title VIII." Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997).

In LaCroix, the plaintiff sued her former employer for discrimination and retaliation. As part of her retaliation claim, plaintiff alleged that she received a negative performance review and a memorandum of deficiency because she complained about sexual harassment. LaCroix v. Sears, Roebuck, and Co., 240 F.3d at 688. In addition, she claims that her immediate supervisor refused to speak to her and intentionally withheld the dates and times of mandatory employment meetings. Id. The court found that neither the negative employment review nor the memorandum of deficiency constituted adverse employment actions because they did not result in a material employment disadvantage. Id. at 691. Moreover, the court determined that her supervisor's refusal to speak to her and inform her of the dates of mandatory meetings did not constitute an

adverse employment action even though her absence was later used as a basis for a subsequent negative performance review because the review did not result in a detrimental change in plaintiff's employment conditions. Id. The court therefore denied plaintiff's retalia1tion claim.

Similarly, in Haynes, plaintiff brought a Title VII action against her former employer, alleging sexual harassment and retaliation. Haynes v. Reebaire Aircraft, Inc., 161 F. Supp. 2d 985 (W.D. Ark. 2001). Plaintiff claimed that she was moved to a smaller desk and given menial tasks within a month of her filing a complaint of sexual harassment. Id. at 989. In addition, she asserts that she was terminated approximately three months after filing her claim. Id. at 990. The court found that plaintiff was not terminated as a result of her complaints. Id. The court determined that moving plaintiff to a smaller desk and giving her menial tasks did not constitute adverse employment actions where the menial tasks were ones that she had previously performed. Id. The court explained: "[Plaintiff] stated that her pay did not decrease, her supervisor did not change, her work hours did not change, and her fringe benefits did not change. Changes in duties or working conditions that cause no materially significant disadvantage, such as reassignment, are insufficient to establish adverse conduct required to make a prima facie case." Id. at 990.

Likewise, in Montandon v. Farmland Industries, Inc., 116 F.3d 355, 359 (8th Cir. 1997), the court found that an undesirable transfer and low performance review were not adverse employment actions because they did not entail a change in plaintiff's position, title, salary or any other aspect of plaintiff's employment.

Similar to LaCroix, Haynes, and Montandon, plaintiff alleges in his complaint that defendant took the following retaliatory actions as a result of plaintiff's protected conduct:

- evaluating plaintiff's performance negatively without cause;
- falsely accusing plaintiff of harassing or intimidating faculty members and students;
- threatening violence against plaintiff;
- telling plaintiff to go on Prozac;
- ridiculing plaintiff at faculty meetings;
- telling students to distance themselves from plaintiff because he was a perceived troublemaker;
- calling plaintiff "irrational;"
- entering plaintiff's office without permission;
- monitoring plaintiff's use of computer equipment and emails;
- interfering with plaintiff's participation in national conferences;
- threatening plaintiff with disciplinary action for opposing racism on campus;
- having plaintiff arrested for participating in a public protest;

- providing false information to the police and paying for the police to arrest plaintiff and others who gathered to protest racism at SCSU. (Pl.'s Complaint at 4-5.)

In response to defendant's memorandum, plaintiff emphasizes three allegedly adverse employment actions: (1) physical threats by the president, (2) the failure to keep a promise by the St. Cloud president to raise plaintiff's salary and (3) plaintiff's arrest for trespassing. While the court will focus its analysis on these three employment actions, the court finds that plaintiff failed to show that any of defendant's actions resulted in a material employment disadvantage and thus constituted an adverse employment action.[8]

**a. Physical Threat by the President**

The court finds that plaintiff failed to prove that the alleged physical threat by the president constituted an adverse employment action. As in LaCroix, Haynes and Montandon, plaintiff does not prove any material changes in his employment as a result of defendant's actions. Like the plaintiff in Haynes, plaintiff

---

[8] While plaintiff argues that negative performance reviews and "papering" of employee's file with negative reports or reprimands constitute adverse employment actions, (Pl.'s Memo. Opp'n Def.'s Mot. Summ. J. at 19), the Eighth Circuit has stated that a "poor performance evaluation, alone, typically does not constitute an adverse employment action." Phillips v. Collings, 256 F.3d at 848. Such evaluations do not constitute adverse employment actions unless they result in a material disadvantage in employment conditions. See LaCroix v. Sears, Roebuck, and Co., 240 F.3d at 692. Here, plaintiff does not show how plaintiff's negative evaluations resulted in a material disadvantage in his employment conditions. Thus, plaintiff's argument fails.

does not allege that his pay decreased, his supervisor changed, his work hours changed, or his fringe benefits changed. Neither does plaintiff claim that defendant's actions resulted in a change in his position, title, salary or any other aspect of his employment conditions, as in Montandon. See also Ledergerber v. Stangler, 122 F.3d at 1144-45(finding that appellant offers no evidence to show adverse employment action where her salary, benefits, responsibilities, title and office location remained the same.). Because plaintiff does not show how this alleged threat materially altered the conditions of his employment, this claim of retaliation fails.

**b. President Grube's Decision Not to Raise Plaintiff's Salary**

The Eighth Circuit has consistently evaluated whether an employment action results in a change or decrease in an employee's salary when evaluating whether the action constitutes an adverse employment action. Haynes v. Räuber Aircraft, Inc., 161 F. Supp. 2d at 990 (finding no adverse employment action, emphasizing that plaintiff's pay did not decrease); Montana v. Farmland Ind., Inc., 116 F.3d at 359 (considering whether employment action entailed a change in plaintiff's salary); Ledergerber v. Stangler, 122 F.3d at 1144 (finding no adverse employment action and noting that plaintiff's salary remained the same). President Grube's decision not to raise plaintiff's salary does not constitutes an adverse employment decision because, as in Haynes and Montandon, this

action did not result in a decrease or other change in plaintiff's salary.

**c. Plaintiff's Arrest**

Likewise, plaintiff's arrest for trespassing does not constitute an adverse employment action. While plaintiff correctly cited a Tenth Circuit case that has found that Title VII's retaliation provisions prohibit an employer from filing criminal charges against an employee in retaliation for the employee's opposition to discrimination, Berry v. Stevinson Chevrolet, 74 F.3d 980 (10th Cir. 1996) ("[M]alicious prosecution can constitute adverse employment action."); see also Aviles v. Cornell Forge Co., 183 F.3d 598 (7th Cir. 1999)(reversing the lower court's ruling and holding that an employer's false police report could support an action for retaliation under Title VII.), plaintiff provides no evidence that defendant instigated a malicious prosecution or that plaintiff's arrest resulted in a detrimental change in the conditions of plaintiff's employment.[9] Because plaintiff provides no evidence of any adverse employment actions, the court grants defendant's motion for summary judgment on plaintiff's retaliation claim.

---

[9] Moreover, even assuming that defendant's action did constitute an adverse employment action, defendant had a legitimate non-retaliatory reason for calling the police. Defendant called the police only after plaintiff and other protestors were asked and refused to leave the president's conference room, where they were protesting SCSU's failure to renew the contract of a Native American employee.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment is granted and plaintiff's claims are dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 10, 2001

David S. Doty, Judge
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500